**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Vickie D. Anderson, an individual,      )      No. CV06-00817-PHX-NVW
                                         )
                 Plaintiff,              )      **ORDER**
                                         )
vs.                                      )
                                         )
                                         )
The State of Arizona,                    )
                                         )
                 Defendant.              )
                                         )
_____ )

         Pending before the court is Defendant's Motion for Summary Judgment (doc. # 34) and Statement of Facts ("DSOF")(doc. # 35), Plaintiff's Response (doc. # 36) and Statement of Facts ("PSOF")(doc. # 36), and the Reply (doc. # 40).  The Motion will be granted for the reasons set forth below.

**I.      Factual Background**

         Construing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, the admissible evidence shows the following.

         Plaintiff Vickie D. Anderson ("Anderson") began working at the Arizona Department of Economic Security ("DES"), Prescott Valley Office, as a Child Protective Service Specialist II ("CPSS II") in April 2001.  (Doc. # 34 at 2.)  This was a "crisis-oriented job." (DSOF Ex. 1 at 13.)  Anderson provided counseling to families that had been referred to Child Protective Services, removed children from troubled homes, and drafted court reports. (Doc. # 34 at 2.)  She was promoted to Child Protective Service Specialist III ("CPSS III")

in April 2002. (*Id*. at 2.) Anderson's new position required her to manage a heavier caseload and to be "on call" for 24-hour periods. (DSOF Ex. 1 at 16.)

### A.    Disability Discrimination

In August 2003, Anderson informed her supervisor, Martin L. Jones ("Jones") that she had diabetes and that the stress of her duties as a CPSS III was causing her symptoms to worsen. (DSOF Ex. 1 at 56.) Anderson requested that she be allowed to maintain a caseload of no more than 12 cases as an accommodation for her diabetes. (*Id*. Ex. 1 at 56.) Martin was "quite supportive," and he granted the reduction on a provisional basis pending formal approval. (*Id*. Ex. 1 at 87.) Before the accommodation, Anderson was handling 17 cases compared to her coworkers' average of 35 cases. (*Id*. Ex. 2.) After the accommodation, Anderson's caseload never increased above 12 without her consent.[1] (*Id*. Ex. 1 at 68.) Anderson's colleagues, who were "seriously overworked," complained on various occasions about the fact that Anderson's caseload was limited to 12 while their caseload remained at 35. (*Id*. Ex. 1 at 86; Ex. 2.)

On December 9, 2003, the Arizona Department of Economic Security determined that Anderson was not eligible for a caseload reduction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (PSOF Ex. 2.) DES explained that Anderson's medical "documentation was insufficient" for purposes of the ADA. (DSOF Ex. 2; *see* PSOF Ex. 14 (medical questionnaire from Anderson's primary care physician, Dr. Dennis Little).) In a follow-up letter to Anderson dated January 14, 2004, Jones wrote, "In the coming weeks ahead and with the workers added to the ongoing unit, I will make attempts to equalize the distributions of cases, but that may still mean that I will assign additional cases to you." (DSOF Ex. 2.) Jones attempted to increase Anderson's caseload, but Anderson consistently refused to take more than 12 cases. (*See* PSOF 2.)

Anderson next met with Jones' immediate supervisor, Assistant Program Manager Ryan Bond ("Bond"). Bond told Anderson that she "was going to have to accept other

---

[1] Anderson volunteered to take a 13th case in one instance. (*Id*. Ex. 1 at 59.)

cases" because she was ineligible for ADA accommodation. (DSOF Ex. 1 at 88.)  Anderson demurred, maintaining that she was entitled to a reduced caseload "due to [her] doctor's recommendations." (*Id*. Ex. 1 at 88.)  The record contains little support for this claim.  In the medical questionnaire submitted to DES, Dr. Little opined that "[b]lindness, neuropathy, [or] death could be induced by overloading [Anderson] with a workload that exceeds her physical ability to handle." (PSOF 2, Ex. 14 at 2.)  Dr. Little did not explicitly limit Anderson to a 12-case workload, however.  The Child Welfare League of America ("CWLA") suggests a maximum of 12-15 cases per social worker. (PSOF Ex. 4; Ex. 15.)  Combining Dr. Little's prognosis with the Child Welfare League's guidelines, Anderson concluded that she could "physically handle" no more than 12 cases at one time–the lowest number of cases recommended by the CWLA, and less than half the 35-case average maintained by Anderson's colleagues.

Telling her supervisors, "I love this job . . . [and] I shouldn't have to die to keep [it]," Anderson continued to press for formal accommodation. (DSOF Ex. 1 at 90.)  On March 19, 2004, she contacted Melissa Ward, a Prescott Valley Office supervisor, to query whether DES considered her "refusal to endanger [her] health because of [her] disability to be insubordinate behavior." (PSOF Ex. 6.)   The next day, Ms. Ward replied :

> I hear what you are saying, your grave concern about your current health.  However, it is my understanding that your requests for ADA have so far been denied.  I have not received any notification to indicate you qualify for a modified case load.  Thus, as your supervisor, the expectation is that you work as much as the other case workers . . . .  The insubordination is your refusal to accept and actively work cases that have been assigned to you.

(*Id*. Ex. 6.)

Anderson went on leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, on April 1, 2004. (DSOF Ex. 1 at 90.)  She never returned to work.  On May 3, May 17, and June 14, 2004, Anderson's psychologist, Douglas A. Bergstrom, Ph.D., certified to DES that Anderson could not "perform the essential duties of her job or any job." (*Id*. Ex. 6, 8-9.)  Dr. Bergstrom diagnosed Anderson with major depressive disorder, severe, without psychotic features. (*Id*. Ex. 1 at 120.)  Anderson resigned on June 14, 2004, while

on medical leave.  (*Id*. Ex. 7.)  She explained, "Due to my disability and the agency's refusal to grant reasonable accommodations I am forced to relinquish my position with DES."  (*Id*. Ex. 7; doc. # 3 at 5-8.)

### B.    Medical Disclosure

Anderson next avers that Jones unlawfully disclosed information regarding her medical condition and her request for a caseload accommodation to Darcy Razo, one of Anderson's coworkers.  (Doc. # 36 at 3; DSOF Ex. 1 69-70.)  In her affidavit, Ms. Razo declares that Jones allowed her to view Anderson's physician's notes, and kept her "updated" on the progress of Anderson's legal action against DES.  (PSOF Ex. 9.)  Neither Anderson nor Ms. Razo identifies when or where the disclosures took place.

The Equal Employment Opportunity Commission ("EEOC"), Phoenix District Office, concluded that Jones disclosed Anderson's disability "in violation of the ADA," but does not specify which statutory provision was violated.  (PSOF Ex. 19 at 2.) Anderson herself has failed to identify the legal basis for what she refers to as her "violation of privacy" claim. (Doc. # 36 at 3.)  Furthermore, Anderson has provided no evidence to suggest that her medical condition and her request for ADA accommodation were in fact confidential. Instead, the frequent complaints about Anderson's reduced caseload suggest that Anderson's colleagues at the Prescott Valley Office knew about her diabetes and her request for a caseload reduction at all relevant times.

### C.    Hostile Work Environment

Anderson further contends that Jones discriminated against her because of her sex, creating a hostile work environment at the Prescott Valley Office.  Although Jones targeted Anderson with profane language and threatening behavior, Anderson primarily complains of  the verbal aggression and a sexual comment endured by Anderson's female coworkers. (*See* DSOF Ex. 1 at 117 (affirming that Anderson's "lawsuit is based on what happened to other people").)

First, Anderson alleges that Jones "screamed and yelled" at Anderson and female Child Protective Service Specialists Holly Petersen, Donna Tew, and Darcy Razo at various

1   times. (*Id.* Ex. 1 at 18-31.) Jones was "very violent toward them, aggressive. He liked use
2   the F word continuously the whole time. He was not aware of how to do the job, so he would
3   be very upset with people if they didn't follow his directions, even if it was wrong, against
4   court orders." (*Id.* Ex. 1 at 18.) When pressed for more specific examples, Anderson
5   testified that Jones "used the word fuck about every third word daily . . . [in] general
6   conversation." (*See id.* Ex. 1 at 27 ("One time, I was sitting in [his] office and we were
7   having a review of cases, and he wanted to call one of the clients . . . [a]nd I wanted to
8   remind him that . . . he may want to watch his language. And he just said, I'll do what I
9   fucking please."); *id.* Ex. 1 at 24 ("Another incident that . . . I heard was [when] Donna
10  [Tew] was in her cubicle and she mentioned that her pet bird had died, and [Jones] came out
11  and [told] her he was going to use something to kill all her other animals.).)

12      Anderson avers that the "[w]omen in the office . . . were affected by" Jones' profanity
13  and verbal aggression. (*Id.* Ex. 1 at 29; *see* PSOF Ex. 7 (Aff. Donna Tew); Ex. 9 (Aff. Darcy
14  Razo).) Anderson and her female colleagues together complained to Ryan Bond and
15  Program Manager Laurie White about Jones' profane language and verbal aggression.
16  (DSOF Ex. 1 at 31-42.) Bond pulled Anderson aside in November 2003 to query whether
17  she was "afraid to be alone" with Jones. (*Id.* Ex. 1 at 51-52.) Anderson replied that she was
18  not, as Jones had met Anderson's "6' 5" 300 lb husband . . . [which] might make [Jones]
19  think twice about sexually harassing [her]," and Anderson had "been threatened by bigger
20  and meaner men than Martin [as a domestic violence social worker] . . . [and would have] no
21  problem smacking the hell out of him if he touched [her]." (*Id.* Ex. 3 at 1.) Anderson and
22  her coworkers subsequently received email messages from Mr. Bond requesting more
23  information about the allegations of Jones' inappropriate conduct. (*Id.* Ex. 1 at 96-97.)
24  Anderson did not respond to any of those emails "because she provided information about
25  a hostile work environment at least three times during the previous four months . . . [and]
26  believed that it was futile to do so again." (*Id.* Ex. 1 at 97, 98; PSOF 7.)

27      Anderson next contends that Jones "made [a] sexual comment[] to her female
28  coworker[]," though not to Anderson herself. (Doc. # 36 at 3.) On one occasion, Anderson

1   overheard Jones discuss "sexual matters that didn't pertain to work-related issues" with

2   Darcy Razo.  (DSOF Ex. 1. at 23 (Anderson heard Jones say that "people . . . have a

3   stereotype that black men have huge penises and white men are jealous . . . something along

4   those lines.").)  Anderson acknowledges that Jones did not make any unwelcome sexual

5   advances toward her or any of her DES colleagues.  (*Id*. Ex. 1 at 27.)

6        On March 1, 2004, Jones was removed from the Prescott Valley Office and transferred

7   to Phoenix.  (DSOF 6.)  DES continued to investigate the foregoing allegations of hostile

8   work environment.  (PSOF Ex. 11.)  At the conclusion of the internal investigation, Jones

9   received a five-day suspension for unprofessional conduct beginning August 16, 2004.  (*Id*.

10  Ex. 10.)

11       **D.    Retaliation**

12       Anderson also contends that Jones retaliated against her for complaining to Ryan

13  Bond and Laurie White about his profanity, yelling, and the sexual comment he made to

14  Darcy Razo.  Though she cannot recall the specific details, Anderson points to three patterns

15  of retaliatory conduct in support of her claim.  (DSOF Ex. 1 at 109.)

16       First, Anderson alleges that Jones instructed her in January 2004, not to discuss her

17  allegations of hostile work environment sexual harassment with new DES employees.  When

18  Anderson refused, Jones "got in [her] face . . . and [she] thought he was going to hit [her]."

19  (DSOF Ex. 1 at 20, 46.)  It is not clear from Anderson's testimony, however, whether Jones

20  was angered by Anderson's refusal to abide by his command to avoid discussing the

21  allegations of sexual harassment, or whether he was instead angered by Anderson's decision

22  not to follow instructions regarding a problematic foster home.  (*Id*. Ex. 1 at 43-46.)

23       Anderson continued to talk about Jones' aggressive behavior with newly hired

24  employees and DES supervisors "pretty openly in the workplace."  (*Id*. Ex. 1 at 82-83.)

25  Jones responded by "nitpicking on [Anderson] with [her] cases . . . did you do this? Did you

26  do that?  Yes, no, whatever.  He just changed immediately."  (*Id*. Ex. 1 at 83, 108-111)

27  Anderson "hid in [her] cubicle" to avoid attracting Jones' attention.  Nevertheless, Jones

28  went out of his way to "visit" Anderson more often, "asking a lot of questions, demanding

1   that I do things that I hadn't done before." (*Id.* Ex. 1 at 83.)  Jones then opted to "ignore[]"

2   Anderson "for a while." (*Id.* Ex. 1 at 83.)

3          Anderson also contends that Jones retaliated against her by formally denying her

4   request for a caseload reduction pursuant to the ADA.  (Doc. # 36 at 14.)

5          **E.     Constructive Discharge**

6          Anderson finally alleges that she was constructively discharged by Laurie White and

7   Ryan Bond in June 2004, after her FMLA leave was exhausted.  (Doc. # 36 at 11.)  She

8   contends that she "had a reasonable belief that . . . when she returned from FMLA leave she

9   would continue to be pressured to take on more cases than recommended by her doctor. (*Id.*

10  at 12; DSOF Ex. 1 at 116.)  Anderson believes that her supervisors "created an intolerable

11  work environment which caused her to take FMLA leave and to not return to work." (*Id.* at

12  12.)

13  **II.     Summary Judgment Standard**

14         Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is

15  proper when "the pleadings, depositions, answers to interrogatories, and admissions on file,

16  together with affidavits, if any, show that there is no genuine issue as to any material fact and

17  that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

18  The court must evaluate a party's motion for summary judgment construing the alleged facts

19  with all reasonable inferences favoring the nonmoving party. *See Baldwin v. Trailer Inns,*

20  *Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).  The evidence presented by the parties must be

21  admissible. Fed. R. Civ. P. 56(e).  Conclusory and speculative testimony in affidavits and

22  moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment.

23  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

24         The party seeking summary judgment bears the initial burden of informing the court

25  of the basis for its motion and identifying those portions of the pleadings, depositions,

26  answers to interrogatories, and admissions on file, together with the affidavits, if any, which

27  it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp.*

28  *v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party has met its initial burden with

a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. *See also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). Summary judgment is not appropriate when the nonmoving party submits evidence from which a reasonable juror, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor. *United States v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999). Although the initial burden is on the movant to show the absence of a genuine issue of material fact, this burden may be discharged by indicating to the court that there is an absence of evidence to support the nonmoving party's claims. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000);

## III. Legal Analysis

### A. Disability Discrimination

Anderson seeks relief for disability discrimination under the Rehabilitation Act ("the Act"), 29 U.S.C. § 794(a), which creates a private right of action for handicapped persons subjected to discrimination by recipients of federal funds. *See Prewitt v. U.S. Postal Service*, 662 F.2d 292 (5th Cir. 1981) (discussing legislative history). Anderson never handled more cases than she wanted to from August 2003, when Jones reduced her caseload, until April 1, 2004, when she went on medical leave. Anderson's Rehabilitation Act claim is therefore founded solely upon the "pressure" she felt "to take on more cases" than she desired. (Doc. # 36 at 12.)

The standards for determining an employment-related violation of the Rehabilitation Act are the same standards used for a similar violation of the Americans with Disabilities Act. 29 U.S.C. § 794(d). Therefore, to make a prima facie case under the Rehabilitation Act, Anderson must show that she (1) is a disabled person within the meaning of the Act; (2) is

1  qualified to perform the essential functions of the job with or without reasonable

2  accommodation; and (3) suffered an adverse employment action because of her disability.

3  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).  The State of Arizona

4  concedes that Anderson "was disabled within the meaning of the Rehabilitation Act," but

5  moves for summary judgment on the second and third elements of the test.  (Doc. # 34 at 11.)

6  The Motion is well taken.

### 1.   Anderson Was not Qualified to Perform the Essential Functions of her Job

8  The State urges that "[i]t is an essential function of the CPSS III position to handle a

9  full caseload."  (Doc. # 34 at 12.)  A "full caseload" at the Prescott Valley Office consists of

10  approximately 35 cases, as evidenced by the fact that Anderson's coworkers maintained a

11  35-case average at all relevant times, and as further demonstrated by Anderson's colleagues'

12  complaints about the workload disparity.  Under the ADA, "consideration shall be given to

13  the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8);

14  29 C.F.R. § 1630.2(n)(3)(vi) ("work experience of past incumbents in the job" is evidence

15  of whether a particular function is essential).  Thus, "A court must give considerable

16  deference to an employer's judgment regarding what functions are essential for service in a

17  particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998).

18  The hortatory guidelines prescribed by the Child Welfare League of America are

19  entitled to no such deference.  (PSOF Ex. 15.)  Indeed, the CWLA intends its 12-15 caseload

20  recommendation "to be [a] goal[] for the continuing improvement of services."  (*Id.* Ex. 15.)

21  That Program Manager Laurie White once considered the CWLA standards to be "reasonable

22  most of the time" does not transform the guidelines into part of the CPSS III job description,

23  as Anderson appears to contend.  (Doc. # 36 at 12.)  The State of Arizona "is not required to

24  allow [Anderson] to do less than half the job [performed by her colleagues] and . . . still get

25  paid for the full job."  (Doc. # 34 at 12.)

26  Anderson carried only 17 to her coworkers' 35 cases prior to making her request for

27  accommodation, and her workload dropped even lower relative to her peers after Jones

28

1   provisionally granted that request.  From August 2003, through April 1, 2004, when she went

2   on FMLA leave, Anderson "simply refused to accept more [than 12] cases."  (DSOF Ex. 1

3   at 56.)  After going on medical leave, Anderson and her psychologist agree that Anderson

4   was incapable of carrying a full workload, or doing any work at all, a fact that prompted her

5   June 14, 2004 resignation.  (DSOF 35.)  Anderson now contends, however, that she was

6   capable of performing the essential functions of her job when she first requested medical

7   accommodation in August 2003.  (Doc. # 36 at 12.)  This argument must be rejected.

8   Changing the time frame from when Anderson was totally incapable of working to when she

9   was able to manage no more than 12 cases is of no moment because social workers in the

10  CPSS III position are required to manage up to 35 cases at a time.  By her own admission,

11  Anderson was physically incapable of working 35 cases as of August 2003.  Therefore, she

12  was not qualified to perform an essential function of her job at that time, or at any time

13  thereafter.

14       Anderson finally contends that she was a "qualified individual who could perform the

15  essential function of her job given a reasonable accommodation of a reduced caseload."

16  (Doc. # 36 at 12.)  However, the Rehabilitation Act does not require DES to accommodate

17  a CPSS III who is physically incapable of managing up to 35 cases at a time where carrying

18  such a workload is deemed to be an "essential function" of the job.  While reasonable

19  accommodation "may include such adjustments as modification of physical facilities, work

20  schedules, or equipment, or some job restructuring, 'reasonable accommodation' does not

21  mean elimination of the job's essential functions."  *Gilbert v. Frank*, 949 F.2d 637, 642 (2d

22  Cir. 1991); *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006) ("The ADA does not

23  require an employer to exempt an employee from performing essential functions or to

24  reallocate essential functions to other employees."); *see* 45 C.F.R. § 84.12 (defining the term

25  "reasonable accommodation").

26       Anderson sought to exempt herself from DES' minimum workload requirement, an

27  "essential function" of her job.  Such an accommodation is inherently unreasonable.

28

1   Therefore, DES' refusal to extend the provisional caseload reduction granted by Jones for

2   the remainder of Anderson's employment was not discriminatory.

3                          **2.      No Adverse Employment Action**

4           Even if Anderson could be deemed "qualified" to perform an essential function of her

5   job with reasonable accommodation, her Rehabilitation Act claim founders on the third

6   element of her prima facie case.  Anderson refused to take on more than 12 cases from

7   August 2003 until April 1, 2004.  During that eight-month period, Anderson was told by

8   various supervisors on multiple occasions that "if [she] didn't accept more cases, [she] would

9   be insubordinate and fired."  (DSOF Ex. 1. at 68.)  Ms. Ward informed Anderson by email

10  that she was in fact insubordinate.  (PSOF Ex. 6.)  Although Anderson's coworkers

11  complained about the uneven work distribution, DES never disciplined Anderson for refusing

12  to take on a full caseload.  The record is totally barren of tangible employment injury.  In

13  fact, Anderson specifically testified that she was "not fired" for refusing to carry a full work

14  load for eight months.  (DSOF Ex. 1 at 68.)  Anderson's disability claim is founded upon

15  nothing more than the psychological  distress she experienced as a result of "pressure to take

16  on more cases than recommended by her doctor."  (Doc. # 36 at 12.)  Pressure to perform an

17  essential  function of  one's  job  is  not  an  "adverse  employment  action"  under  the

18  Rehabilitation Act, the ADA, Title VII, or any other federal law.  *Cf. Dipol v. New York City*

19  *Transit Auth*., 999 F. Supp. 309 (E.D.N.Y. 1998) (employer's actions of placing employee

20  on no-work status immediately after learning of diabetic condition and subsequently

21  restricting employee's duties constituted "adverse employment action" under the ADA).

22          It is well settled that "not everything that makes an employee unhappy is an actionable

23  adverse action."  *Smart v. Ball State Univ*., 89 F.3d 437, 441 (7th Cir. 1996).  "To establish

24  an adverse employment action in the absence of a diminution in pay or benefits, Plaintiff

25  must show an action with materially adverse consequences affecting the terms, conditions,

26  or privileges of employment.  The employment decision must inflict objectively tangible

27  harm."  *Moore v. Ashcroft*, 401 F. Supp.2d 1, 24 (D.D.C. 2005) (citations and internal

28  quotations omitted) (discussing Rehabilitation Act cases); *Elvig v. Calvin Presbyterian*

1  *Church*, 375 F.3d 951, 960-61 (9th Cir. 2004) (same).  A "tangible employment action
2  constitutes a significant change in employment status, such as hiring, firing, failing to
3  promote, reassignment with significantly different responsibilities, or a decision causing a
4  significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

5      Anderson has failed to establish both the second and the third elements of her prima
6  facie case.  Her claim for disability discrimination under the Rehabilitation Act will therefore
7  be dismissed pursuant to Fed. R. Civ. P. 56(c).

8      **B.    Medical Disclosure**

9      Construing the evidence in the light most favorable to Anderson, the record shows that
10  Jones told Ms. Razo about Anderson's diabetes, disclosed medical notes of Anderson's
11  treating physician and psychologist, and informed her about the fact that Anderson was
12  pursuing legal action against DES on various occasions and without Anderson's consent.
13  (DSOF Ex. 1 69-70, PSOF Ex. 9.)  Anderson has failed, however, to identify any factual or
14  legal basis for her "invasion of privacy" claim, either under the Arizona law of torts or
15  federal statutory law.  The court is not required to perform Anderson's research for her.  The
16  claim will therefore be dismissed.

17      The court notes, however, that the EEOC erred in determining that Jones' disclosure
18  of Anderson's disability violated an unspecified provision of the ADA.  (PSOF Ex. 19 at 2.)
19  The dissemination of confidential medical information to persons with no legitimate need for
20  the information is not actionable under the ADA where that information was not first
21  obtained by the employer as a condition of employment.  42 U.S.C. § 12112(d).  Anderson
22  voluntarily disclosed her medical condition to Jones long after she was hired by DES, and
23  she alleges no tangible employment injury from that disclosure.  Neither the ADA, the
24  Rehabilitation Act, nor the FMLA apply in such circumstances.  *Fredenburg v. Contra Costa*
25  *County Dep't of Health Serv*., 172 F.3d 1176, 1181 (9th Cir. 1999); *Cash v. Smith*, 231 F.3d
26  1301, 1307 (11th Cir. 2000); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 971 (8th
27  Cir. 1999); *Fritsch v. City of Chula Vista*, 11 Am. Disabilities Cas. 273 (S.D. Cal. 2000).

28

1    Anderson attaches great importance to the EEOC's reasonable cause determination,

2    both as to her medical disclosure and Title VII claims.  (Doc. # 36 at 3, 6-7; PSOF Ex. 19.)

3    That reliance is misplaced.  The EEOC's determination letter is admissible, *Plummer v.*

4    *Western Intern. Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981), but it has no probative value

5    here.  The EEOC's reasonable cause determination does not create a genuine issue of

6    material fact in this case because its conclusory findings are not grounded in a discussion of

7    operative facts or statutory authority.  "It is impossible from this letter to know what facts

8    the EEOC considered and how it analyzed them."  *Coleman v. Quaker Oats Co.*, 232 F.3d

9    1271, 1283 (9th Cir. 2000) (rejecting a similarly conclusory EEOC determination).

10            **C.    Hostile Work Environment**

11            Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an

12    unlawful employment practice for an employer . . . to discriminate against any individual

13    with respect to his . . . terms, conditions, or privileges of employment, because of such

14    individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court has interpreted the

15    quoted language as evincing "a congressional intent to strike at the entire spectrum of

16    disparate treatment of men and women in employment."  *Meritor Savings Bank, FSB v.*

17    *Vinson*, 477 U.S. 57, 64 (1986) (citations and internal quotations omitted).  However, not all

18    verbal or physical harassment in the workplace is actionable under Title VII.

19            "To prevail on a hostile work environment sexual harassment claim, the plaintiff must

20    show that her work environment was both subjectively and objectively hostile; that is, she

21    must show that she perceived her work environment to be hostile, and that a reasonable

22    person in her position would perceive it to be so."  *Dominguez-Curry v. Nev. Transp. Dep't*,

23    424 F.3d 1027, 1034 (9th Cir. 2005) (citations omitted).  "The plaintiff also must prove that

24    any harassment took place because of sex."  *Id*. (citations and internal quotations omitted);

25    *see EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844 (9th Cir. 2005) (harassing conduct

26    need not be motivated by sexual desire to support an inference of discrimination on the basis

27    of sex).

28

1    In analyzing whether the alleged conduct created an objectively hostile work
2    environment, the court "assesses all the circumstances, including the frequency of the
3    discriminatory conduct; its severity; whether it is physically threatening or humiliating, or
4    a mere offensive utterance; and whether it unreasonably interferes with an employee's work
5    performance." *Dominguez-Curry*, 424 F.3d at 1034 (citations and internal quotations
6    omitted).  In reviewing the totality of the evidence adduced by Anderson in support of her
7    hostile work environment claim, the court is mindful that Title VII does not establish a
8    "general civility code" for the American workplace.  *Oncale v. Sundowner Offshore Servs.*,
9    523 U.S. 75, 81 (1998).  Simple teasing, offhand comments, or isolated incidents of offensive
10   conduct generally will not support a claim of discriminatory harassment.  *Faragher v. City*
11   *of Boca Raton*, 524 U.S. 775, 788 (1998); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893
12   (9th Cir. 2005).  Rather, liability attaches when the "workplace was permeated with
13   discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive
14   enough to alter the conditions of her employment and create an abusive working
15   environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 921 (9th Cir. 2000) (citations and
16   internal quotations omitted); *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).

17   Anderson has failed to make a prima facie case for hostile work environment sexual
18   harassment under these standards.  The State of Arizona accepts all of Anderson's factual
19   allegations regarding Jones' behavior as true.  (Doc. # 34 at 5.)  Even under that generous
20   assumption, Anderson has not identified any sex-based discriminatory conduct sufficiently
21   severe or pervasive to trigger Title VII liability.  Stripped of excess verbiage, Anderson seeks
22   relief for Jones' use of the word "fuck" in a non-sexual manner, as in "this fucking table" or
23   "I'll do what I fucking please,"his "screaming and yelling" at male and female employees
24   at the Prescott Valley Office, his threat to kill all of Donna Tew's pets, his comment about
25   "penises" to Darcy Razo, and the general feeling shared by Anderson's colleagues, and
26   eventually by Anderson herself, albeit for only one month, that Jones posed a physical threat.
27   These allegations are insufficient.

28

1     **1.**  **The Work Environment Was not Objectively Hostile**

2     **i.**  **Sexual Harassment Directed Toward Others**

Anderson concedes that her sexual harassment hostile work environment claim is founded primarily upon "what happened to other people." (DSOF Ex. 1 at 117.) While such allegations have some relevance in demonstrating the existence of a hostile work environment, *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995), "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Fin.*, 117 F.3d 1134, 1144 (7th Cir. 1997); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110-11 (9th Cir. 2000) (Rejecting hostile work environment claim founded upon derogatory comments made in the workplace about others.  Plaintiff listened to supervisor call female colleagues names such as "hyena," "madonna," and "castrating bitch," but the comments were not actionable because they "were about other people . . . . He never directed sexual insults at [the plaintiff].").

Anderson has failed to identify any authority in support of her contention that a reasonable woman would find Jones' threat to kill another woman's pets "sufficient or pervasive enough to alter the conditions of her employment" so as to create an objectively hostile or abusive work environment. *Brooks*, 229 F.3d at 921.  *Faragher*, where the Supreme Court held that "isolated incidents of offensive conduct generally will not support a claim of discriminatory harassment," is directly to the contrary.  524 U.S. at 788.  This is especially true where, as here, there is no indication that Jones threatened the female social worker's pets "because of" that employee's sex.

Anderson has similarly failed to create a triable issue of fact as to whether a reasonable woman would find her workplace to be "permeated with discriminatory intimidation" where her supervisor discussed "penis myths" with a female coworker on one occasion within earshot. *Brooks*, 229 F.3d at 921.  Anderson is not entitled to trial on these claims because Jones' comments would not affect the conditions of employment to the degree necessary for a violation of Title VII. *Meritor Savings Bank,* 477 U.S. at 64.

1
2

ii.      **Sexual Harassment Directed Towards Anderson and Others**

a.      **Profanity**

3    The record shows that Jones targeted Anderson and her fellow social workers, male
4    and female alike, with profane language of a non-sexual character on a daily basis.  (*E.g.*,
5    DSOF Ex. 1 at 27 (Jones used profanity in "general conversation"); PSOF Ex. 9 Aff. Darcy
6    Razo ("Martin Jones used profanity almost in every statement he made.  He used the wor[d]
7    'fuck' constantly . . . .  He had no regard for whom he was speaking (sic) and used 'fuck' in
8    front of women.").)  Jones' supervisors disciplined him for his coarse language, but with little
9    effect.  (*Id*. Ex. 9 (Jones' "behavior was better for about a week and then he resumed his
10   word choices of profanity again.").)  For the sake of further discussion, the court will assume,
11   despite the lack of evidence, that Jones showered Anderson and her female coworkers with
12   profanity because of their sex rather than for some non-discriminatory reason, such as his
13   general churlishness.

14   Jones' vulgar outbursts are not actionable under Title VII unless a reasonable woman
15   would find them sufficiently severe or pervasive so as to alter the conditions of her
16   employment.  That Jones failed to display both the judgment and the refinement in language
17   expected of an individual in his supervisory position cannot reasonably be disputed.
18   However, Jones never crossed the line between creating a merely unpleasant working
19   environment and creating a truly hostile or abusive one.  *Cf. Steiner v. Showboat Operating*
20   *Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994) (pervasive stream of vulgar gender-based epithets
21   and explicit references to women's bodies and sexual conduct by supervisor created
22   objectively hostile and abusive work environment).

23   Particularly instructive in this regard is *Gleason*, 118 F.3d at 1143.  Noting that Title
24   VII was "not designed to purge the workplace of vulgarity," and also that "a certain amount
25   of vulgar[ity] is inevitable in the modern workplace . . . with coarse or boorish workers," the
26   Seventh Circuit held that a supervisor's "overbearing and abusive manner," and his "talking
27   down" to lower level employees, even when combined with profane language and obscene
28   gestures, did not "rise to the level of sexual harassment."  *Id*. at 1144-45 (citations and

1   internal quotations omitted); *see Meritor Savings Bank*, 477 U.S. at 67 (mere utterance of

2   epithet which engenders offensive feelings insufficient); *Minor v. Ivy Tech State College*, 174

3   F.3d 855, 858 (7th Cir.1999) ("It is not enough that a supervisor . . . fails to treat a female

4   with sensitivity, tact, and delicacy . . . .   Such failures are too commonplace in today's

5   America, regardless of the sex of the employee, to be classified as discriminatory."); *Moore*

6   *v. Grove North Am.*, 927 F. Supp. 824, 830 (M.D. Pa. 1996) ("Plaintiff has not cited, nor has

7   our research disclosed, a single case in which a court held that a plaintiff had established a

8   hostile work environment where a supervisor simply used inappropriate language [an

9   offensive four letter word] in front of male and female employees.").

10          It should be noted that Jones' liberal use of the word "fuck" in daily conversation,

11  even after his supervisors informed him that his coworkers found his diction offensive,

12  somewhat lowers the threshold for a triable issue of fact on the issue of a objectively hostile

13  work environment.  "The rule is that the required showing of severity varies inversely with

14  the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.

15  1991).  But even if Jones' language was sufficient to alter the work environment from the

16  perspective of a reasonable woman, Anderson's sexual harassment claim fails because she

17  did not subjectively perceive her supervisor's profanity to be so abusive.

18                      **2.      The Work Environment Was not Subjectively Hostile**

19                              **i.      Profanity**

20          Anderson must create a triable issue of fact both as to the objective and the subjective

21  hostility of her workplace. *Dominguez-Curry*, 424 F.3d at 1034.  While the record shows

22  that Anderson joined her colleagues Darcy Razo, Donna Tew and Holly Petersen in

23  complaining as a group about Jones' language (DSOF Ex. 1 at 28-29), Anderson was not

24  troubled enough by Jones' invective to personally object to it during a meeting with a DES

25  investigator on March 1, 2004, the day Jones left the Prescott Valley Office, or at any other

26  time. (*See* PSOF 7.)  During that meeting, Anderson testified that she had not "experienced

27  any comments" from Martin that she *subjectively* believed to be "sexual (sic) inappropriate."

28  (DSOF Ex. 4.)  Anderson could not have been exposed to any further contumelies from her

1   supervisor prior to leaving DES on April 1, 2004.  Anderson's sworn statement is fatal to her

2   claim.  She may not seek relief under Title VII on the basis on Jones' frequent use of the

3   infamous four-letter word.

4                        ii.    **Physical Threats**

5          Anderson's contention that she was "fearful" of Jones on account of his "screaming

6   and yelling" is also insufficient.  (Doc. # 36 at 4.)  The record shows that some of Anderson's

7   female colleagues were in fact "afraid to be alone with" Jones as they feared he "might

8   become physically violent" toward them.  (PSOF 6, Ex. 13 at 3; DSOF Ex. 1 at 22-23.)  This

9   evidence may create a triable issue as to whether a reasonable woman in Anderson's position

10  would find Jones' threatening behavior "sufficiently severe or pervasive enough to alter the

11  conditions of her employment and create an abusive working environment." *Brooks*, 229

12  F.3d at 921.  The many instances in which Jones managed the Prescott Valley Office by

13  raising his voice rather than by persuading with cool reason made life unpleasant for

14  Anderson.  But Anderson did not feel physically threatened by Jones, at least as of November

15  2003, when she stated to Ryan Bond that she "had no problem dealing with Martin [Jones]

16  because [of her] background . . . in Domestic Violence," which exposed her to "bigger and

17  meaner men than Martin."  (DSOF Ex. 3.)  Drawing strength in no small part from Jones'

18  acquaintance with Anderson's "6' 5" 300 lb. husband," Anderson explained that she had "no

19  problem smacking the hell out of [Jones] if he touched [her]." (*Id.* Ex. 3.)  Because Anderson

20  was not physically intimidated by Jones as of November 2003, she could not have

21  subjectively perceived her work environment to hostile or abusive at that time.  *Dominguez-*

22  *Curry*, 424 F.3d at 1034.

23         In February 2004, one of Anderson's female coworkers at the Prescott Valley Office,

24  CPSS III LaRae Townsend, died from a self-inflicted gunshot wound.  (PSOF Ex. 11 at 2

25  (April 1, 2004 DES Report noting that Phoenix Police Department suspects "Ms. Townsend

26  committed suicide.").)  In her March 1, 2004 statement to DES investigators, Anderson

27  averred that she "became scared to be with Mr. Jones because we thought that he may have

28  been involved in [Townsend's] death."  (DSOF Ex. 4 at 2.)  Anderson justified her fear of

Jones, whom she had previously characterized as non-threatening, by noting that she had heard a rumor from her female colleagues that Jones was sexually involved with Ms. Townsend prior to her death, "had a gun in his car," and was "impotent," which she believed was "another piece of the criteria for an extremely violent batterer." (*Id.* Ex. 1 at 114, Ex. 4 at 2; doc. # 36 at 5.)  Anderson disclaims any personal knowledge of these allegations, which she learned about from others. (PSOF 8.)  There is no evidence to support the rumors and innuendo about Jones, without which Anderson's fears lack foundation. (*See* doc. # 40 at 2-3.)

Nevertheless, the court accepts Anderson's contention that she became fearful of Jones between February 2004, when she first learned of Townsend's death, and March 1, 2004, when Jones left the Prescott Valley Office for Phoenix.  Anderson's testimony does not suggest, however, that she felt apprehensive around Jones *because of* her sex.  42 U.S.C. § 2000e-2(a)(1).  Rather, Anderson's testimony demonstrates that she was afraid of Jones because of the rumor and innuendo suggesting that he battered and even murdered Ms. Townsend.  To survive summary judgment, the law requires Anderson to adduce some evidence tending to show that, upon learning of Ms. Townsend's death, Jones verbally threatened Anderson at the workplace because she is a female.  *Oncale*, 523 U.S. at 80; *Brooks*, 229 F.3d at 927 ("[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII.").

Anderson herself presents no such evidence.  (DSOF Ex. 1 at 33 (Jones "was screaming and yelling at everybody, at all the staff.").)  Anderson's female colleagues, Donna Tew and Darcy Razo, declared that Jones verbally abused females more frequently than males, but provide no specific evidence to support their statements as to what they did not observe.  (PSOF Ex. 7; 9.)  A reasonable jury could not conclude on this record that Jones targeted Anderson because of her gender between February and March 2004, the only time that Anderson subjectively believed that she *would* have had a problem "smacking the hell out of [Jones] if he touched [her]." (DSOF Ex. 13.).  For example, Anderson did not perceive an increase in the intensity or severity of Jones' "screaming and yelling" at the Prescott Valley

1  Office after learning of Townsend's death.  Nor does Anderson disclose any physical conduct

2  by Jones that caused her to fear for her safety during the relevant one-month period.  The only

3  thing that changed was Anderson's interpretation of Jones' periodic fits of "screaming and

4  yelling," which were directed toward  both male and female members of the Prescott Valley

5  Office, and occasionally to Anderson herself.  Whereas Anderson previously wrote off Jones'

6  behavior as so much blustering, upon learning of Townsend's death and the gossip suggesting

7  Jones' possible involvement, Anderson's training as a social worker led her to conclude that

8  Jones' aggressive behavior could manifest itself physically.  A changed interpretation of

9  previously non-threatening verbal abuse is no substitute for evidence of gender-based

10  harassment.

11      Anderson attempts to elide her burden of proof by citation to *Nat'l Educ. Ass'n*, where

12  the Court of Appeals for the Ninth Circuit held that "a pattern of abuse in the workplace

13  directed at women, whether or not it is motivated by 'lust' or by a desire to drive women out

14  of the organization, can violate Title VII," even when that conduct is not "facially sex–or

15  gender-specific."  422 F.3d at 845, 846.  Anderson's reliance upon  *Nat'l Educ. Ass'n* is

16  misplaced.  In that case, the verbal abuse experienced by female employees was accompanied

17  by overt physical acts such as violent lunging, fist shaking and pumping, stalking, grabbing

18  female employees by the shoulders, and other physical acts testified to by male and female

19  employees and documented by police reports.  *Id*. at 843-45.  The only physical act alleged

20  here is Jones' "yelling and screaming" at a close distance.  Furthermore, to surmount the

21  statutory "because of her sex" requirement, 42 U.S.C. § 2000e-2(a)(1), the claimant in *Nat'l*

22  *Educ. Ass'n* adduced evidence showing objective differences in treatment of male and female

23  employees.  For example, while the male supervisor had a "bantering," "we're all guys here"

24  relationship with male employees, he abused female employees to such an extent that he

25  evoked tears, panic, avoidance behavior, calls to the police, and resignations.  *Id*. at 846.

26  Anderson has not identified any evidence, whether circumstantial or direct, tending to show

27  a qualitative or quantitative difference in treatment between male and female employees

28  during the relevant one-month period.

1    The final component of Anderson's hostile work environment claim fails because she

2  has not created a triable issue of fact as to whether Jones threatened her because of her gender

3  between February and March, 2004.  Anderson's apprehension was caused not by Jones'

4  discriminatory conduct toward women, but rather by Jones' romantic involvement with and

5  enmity toward one particular female colleague, now deceased.

6    **D.    Retaliation**

7    To make a prima facie case of retaliation under Title VII, Anderson must show (1)

8  involvement in a protected activity, (2) an adverse employment action, and (3) a causal link

9  between the two.  *Brooks*, 229 F.3d at 928.  The court will assume for purposes of this

10  discussion that Anderson's complaints to management about Jones' obscenity and verbal

11  aggression, both personally and on behalf of her fellow employees, was a protected activity

12  under Title VII.  *Id*. at 928; *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1514 (9th Cir. 1989).

13  Anderson's claim founders on the second element of her prima facie case, however, as she

14  provides no evidence of an adverse employment action.

15    Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is not "conterminous"

16  with Title VII's substantive provision, 42 U.S.C. § 2000e-2(a)(1), because it proscribes more

17  than the just workplace-related or employment-related discrimination. *Burlington N. & Santa*

18  *Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006).  However, the anti-retaliation provision

19  does not protect an employee from *all* retaliation, but only from "retaliation that produces

20  injury or harm." *Id*. at 2415 (emphasizing the importance of separating "significant from

21  trivial harms").  To state a claim under Title VII's anti-retaliation provision, "a plaintiff must

22  show that a reasonable employee would have found the challenged action materially adverse,

23  which in this context means it might have dissuaded a reasonable worker from making or

24  supporting a charge of discrimination." *Id*. at 2415 (citations and internal quotations omitted).

25  Anderson avers that Jones retaliated against her by formally denying her request for a

26  caseload reduction, publicly rebuking her, and subjecting her to increased scrutiny at the

27  workplace.  None of these contentions suffices under *White*'s "materially adverse" objective

28  standard.

1    As to the first instance of retaliatory conduct, the record evidence establishes that

2  Anderson's ADA accommodation request was denied for failure to provide Jones and his

3  supervisor, Mr. Bond with legally sufficient documentation.  (PSOF Ex. 2, 3.)  Anderson

4  identifies no evidence to suggest that her request was denied for any other reason, retaliatory

5  or otherwise.  The formal denial of ADA accommodation is of a little consequence, however,

6  as Jones provisionally reduced Anderson's caseload in August 2003, and Anderson

7  successfully resisted all attempts by DES to increase her caseload for the remainder of her

8  employment.  Pressure to conform to minimum workload requirements, in the absence of

9  formal discipline, is not an "adverse employment action" within the meaning of Title VII's

10  anti-retaliation provision.

11    Second, Anderson points to a specific instance in January 2004, during which Jones

12  "got in [her] face," and "came unglued" because Anderson did not comply with his

13  instructions regarding a problematic foster home.  (DSOF Ex. 1 at 43-47.)  Anderson alleges

14  that Jones raised his voice and threatened to fire her for "insubordination" in retaliation for

15  her failure to comply with his prohibition on discussing allegations of sexual harassment with

16  new employees, which Anderson believed to be a protected activity.  Even when assaying the

17  evidence in the light most favorable to her, Anderson's testimony cannot bear the weight she

18  now places upon it.[2]

19    Title VII does not empower this court to sit as a "super personnel department that re-

20  examines an entity's business decisions."  *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464

21  (7th Cir. 1986).  If a reasonable employee would not have been dissuaded from making or

22  supporting a charge of discrimination by the challenged retaliatory act, then Title VII liability

23  will not lie.  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (Title VII's anti-

24  retaliation provision "does not cover every offensive utterance by co-workers, because

25

26    [2]It should be noted that Anderson's contention that she "thought [Jones] was going

27  to hit [her]" during the January confrontation is belied by her own sworn testimony, where
    she stated that she did not feel physically threatened by Jones until learning of Ms.

28  Townsend's death in February, 2004, weeks after this incident took place.  (DSOF Ex. 4.)

1    offensive statements by co-workers do not reasonably deter employees from engaging in
2    protected activity."); *see Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)
3    (bad-mouthing and verbal threats insufficient under First Amendment wrongful retaliation
4    claim).

5         The challenged conduct falls short of *material* adversity when viewed from the
6    perspective of a reasonable woman in Anderson's position.  *White*, 126 S. Ct. at 2415
7    (emphasis in original).  Jones was angered by his employee's chronic refusal to follow his
8    instructions, and he admonished her for this reason.  Social workers in the Prescott Valley
9    Office had thick skins, and the challenged conduct, though clearly unpleasant, would not
10   impair such an employee's "unfettered access" to Title VII's remedial mechanisms on these
11   facts.  *Id*. at 2415.  What is more, Anderson and her colleagues continued to warn new
12   employees and complain publicly about Jones "pretty openly in the workplace" after the
13   January confrontation took place.  (*See* DSOF. Ex 1 at 82-83.)  Anderson's contention that
14   she or any of her colleagues would be dissuaded from complaining or assisting in complaints
15   about discrimination by Jones' "offensive utterances" finds no support in the applicable law
16   or the record evidence.  *Ray*, 217 F.3d at 1243.

17        Anderson finally avers that Jones retaliated against her by "nitpicking" her work and
18   "visiting" her cubicle more often to pose inane and repetitive questions.  (DSOF Ex. 1 at 83,
19   108-11.)  Such criticism is not sufficiently significant for anti-retaliation liability to attach.
20   *White*, 126 S. Ct. at 2415 ("An employee's decision to report discriminatory behavior cannot
21   immunize that employee from those petty slights or minor annoyances that often take place
22   at work and that all employees experience."); *Signal v. Gonzales*, 430 F. Supp. 2d 528, 541
23   (D.S.C. 2006) ("Increased scrutiny of an employee under the general policies and disciplinary
24   procedures governing her employment is . . . not an adverse employment action.") (citation
25   and internal quotations omitted); *see Birch v. Cuyahoga County Probate Court*, 392 F.3d 151,
26   159 (6th Cir. 2004) (same in First Amendment context).  Anderson was clearly annoyed by
27   Jones' questioning, and she did not appreciate the increased demands Jones placed on her
28   time, which she guarded jealously.  But Jones' requests, while onerous, fell well within

1  Anderson's job title as a CPSS III, and they cannot reasonably be construed as materially
2  adverse in this context. Jones simply told Anderson to do her job. There was no retaliatory
3  animus or chilling effect here.

4  Having failed to identify any evidence of an adverse employment action, Anderson's
5  retaliation claim will be dismissed pursuant to Fed. R. Civ. P. 56(c).

6  **E.   Constructive Discharge**

7  Anderson's remaining claim need not detain the court for long.   Under the doctrine
8  of constructive discharge, employee resignation in response to objectively unreasonable and
9  intolerable retaliation on the part of the employer is the functional equivalent of a formal
10  discharge for remedial purposes. *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).Thus,
11  if Anderson were constructively discharged, her Title VII damages would not necessarily have
12  been cut off by her resignation on June 14, 2004. *See* 1-15 *Larson on Employment*
13  *Discrimination* § 15.08 (2d ed. 1999). But constructive discharge is not a cause of action in
14  its own right.

15  A prima facie case for constructive discharge requires "something more" than
16  actionable discrimination. *Suders*, 542 U.S. at 147; *Brooks v. City of San Mateo*, 229 F.3d
17  917, 930 (9th Cir. 2000) ("Where a plaintiff fails to demonstrate the severe or pervasive
18  harassment necessary to support a hostile work environment claim, it will be impossible for
19  her to meet the higher standard of constructive discharge: conditions so intolerable that a
20  reasonable person would leave the job."); *see Munday v. Waste Mgmt. of N. Am.*, 126 F.3d
21  239, 243 (4th Cir. 1997) (retaliatory constructive discharge requires more than prima facie
22  case of retaliatory adverse employment action). There is no legally cognizable injury to be
23  remedied here. Having failed to make a prima facie case of disability discrimination, hostile
24  work environment sexual harassment, or retaliation, Anderson's claim for back pay and other
25  post-termination damages under the doctrine of constructive discharge must be dismissed.

26  IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment
27  (doc. # 34), is granted.

28

1    IT IS FURTHER ORDERED the clerk enter judgment in favor of Defendant State of

2  Arizona, and that Plaintiff Vickie D. Anderson take nothing on her Complaint. The clerk shall

3  terminate this action.

4    DATED this 15th day of May 2007.

5

6

7  _____

          Neil V. Wake

8        United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28